***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence, receive further evidence and to amend the prior Opinion and Award. The Full Commission therefore reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pretrial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
All parties are properly before the North Carolina Industrial Commission. The Industrial Commission has jurisdiction of the parties and the subject matter of this action. All of the parties are subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
An employer-employee relationship existed between Perdue Farms and plaintiff at all relevant times.
Plaintiff's average weekly wage will be determined from a Form 22 to be provided by defendants and/or from the evidence taken at the hearing before the Deputy Commissioner.
Perdue Farms was an approved self-insured with Crawford Company acting as its servicing agent at all relevant times herein.
The issues to be determined are as follows:
 Whether plaintiff developed an occupational disease as a direct result of employment with Perdue Farms.
 If so, what, if any, workers' compensation benefits is plaintiff entitled to receive.
 Did plaintiff unjustifiably refuse suitable employment offered by Perdue Farms.
 Whether plaintiff is disabled as a result of a compensable occupational disease.
 ***********
The Pre-Trial Agreement along with its attachments and any stipulations that have been submitted by the parties are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
Pamela James was born in 1960. She is 5' 1" tall. She began working for Perdue Farms shortly after graduating from high school. After a short break she returned to work there in 1984. Her only significant work experience is at Perdue.
Plaintiff worked in various jobs with Perdue, primarily as a venter, trimmer, draw hand, and at the salvage station. All of these jobs were repetitive motion jobs working at lines with line speeds of 71 to 91 birds per minute. Venter involved checking the lungs and opening with her hands the birds as they came past her on the production line. Trimmer involved trimming fat off the birds with a knife. Draw hand involved opening the rib cage of the bird and drawing the entrails out of the bird as it passed by. The salvage station was not as line-oriented but involved steady repetitive work with a knife trimming up the useable portions of discarded birds.
The work at Perdue made her hands hurt. The pain grew worse the longer she worked there. Her hands would tingle and ache, and the pain spread to her shoulders and back. The pain kept her awake at night and she had a hard time sleeping. Her pain became constant and widespread.
Medical records indicate that plaintiff began seeking medical attention for hand pain and numbness in 1989 or 1990. She was seen by Dr. Bloem in September 1990 complaining of pain in both wrists. On December 10, 1990 Dr. Bloem noted mildly positive EMGs, injected her elbow, and was generally unsure of the diagnosis.
As of December 11, 1991 Dr. Clayton diagnosed bilateral hand pain, etiology unknown. On March 31, 1992 she was seen by Dr. Harmon, a rheumatologist, who assessed "extremity muscle fatigue". The plant nurse noted hand cramping on 5/19/92. On 7/22/92, Dr. Clayton assessed her as having fibrositis with right hand involvement, and identified as the cause "pulling/grasping". On September 18, 1992, he made the same diagnosis, fibrositis, identifying the cause as "cumulative trauma". Dr. Frank Fleming, a neurologist, suspected carpal tunnel syndrome in October 1992. Fibromyalgia was diagnosed in 1992, along with a report that her arms became dead with increased activity.
As of March 1, 1993, Plaintiff was still complaining of hand pain to the plant nurse. Some median nerve distribution sensory loss was detected as of June 17, 1993. Cervical MRI was negative on September 4, 1993. On September 27, 1993, she complained that her hand was getting numb, and a minimal right median neuropathy was diagnosed; Dr. Hansen diagnosed mild carpal tunnel syndrome.
In October 1993 Plaintiff reported to mental health, where her primary concern was her chronic pain and the inability of her physicians to identify and correct the problem. She felt they were "lying". —
On January 31, 1994, she saw Dr. Kanna, who noted left sided weakness hand and arm pain but felt this was probably not a progressive disorder. Dr. Kanna doubted her diabetes had been present long enough to cause radiculopathy. On March 25, 1994, Plaintiff complained of left sided weakness, worse in the last seven months. She was admitted on May 10, 1994 to Bertie Hospital for pain, with a release diagnosis by Dr. Reaves of fibromyalgia.
As of August 11, 1994 her condition was unchanged according to Dr. Hansen, whose diagnosis was myofascial pain syndrome and carpal tunnel syndrome. A positive Tinel's sign was noted by the nurse.
On February 2, 1995, Dr. Hansen discussed with plaintiff her contention that her work was causing her problems and that if that were so she should consider working elsewhere. He diagnosed right wrist tendonitis on March 23, 1995.
Plaintiff was out of work due to chronic pain from July 2, 1993 to January 14, 1994 on a company disability plan. She remained out of work through July 10, 1994 when she worked a week and a half, then went out of work again through November 20, 1994. She stayed at work through March 19, 1995 and continued to complain of pain in her hands and arms. Finally she had a discussion with Bob Bullock, the plant manager, who told her there was no light duty for her and to stay home until she was able to return to work.
In November 1996 Plaintiff was again evaluated at mental health, with primary focus on pain and lack of sleep; she could fall asleep but would awaken due to stress or pain.
Plaintiff was seen July 27, 1998 in Williamston by Dr. Solito, who took a report of continuous aching in shoulders and hands, and noted a positive Phalen's sign; he diagnosed fibromyalgia and carpal tunnel syndrome.
Plaintiff did miss work in 1991 due to lumbar subluxation following an automobile accident. Associated radiculopathy was also noted. She was out through August 13, 1991. Her next complaint to plant staff was of bilateral hand pain on December 11, 1991, stated by her to have begun in July 1990. She was seen at the Wilson Clinic from August through December 1991 with complaints of thoracic and lumbar pain, radiating into her feet. No mention is made in Wilson Clinic records of hand.
Plaintiff's pain has not stopped, making it hard for her to function at home. The pain is mostly in her shoulders and anus. She applied for Social Security disability benefits but was denied.
Plaintiff was diagnosed with diabetes sometime in the late 1980's and is still diabetic.
Dr. Robert Hansen is a neurologist whose practice works on a contract with Perdue, operating a wellness center at its plant. He is familiar with the plant and the kind of work that is done there. He felt that the work was hard on the hands and there is an increased risk of developing hand pain and problems. Plaintiff was using her hands in high risk activity.
Dr. Hansen was aware that plaintiff was diabetic. He believed that this probably played a significant role in the development of her carpal tunnel condition. Dr. Hansen however could not apportion what part the work and what part the diabetes played.
Dr. Hansen never diagnosed plaintiff with any significant carpal tunnel syndrome although she did have a mild EMG reading. He did believe that her pain was genuine.
In Dr. Hansen's opinion, the main problem underlying fibromyalgia is lack of restorative sleep. Plaintiff did have a pattern of sleep disturbance which was typical for the condition. Medical treatment is available but not very successful. Fibrositis, fibromyalgia. and myofascial pain syndrome are all basically the same condition, in Dr. Hansen's opinion.
Dr. Hansen on direct examination stated positively that the work at Perdue was a significant contributing factor in the pain experienced by Plaintiff. He agreed with Dr. Clayton that repetitive trauma at Perdue probably was a contributing factor in the painfullness of her fibromyalgia.
Dr. Hansen testified that the work is "a significant factor . . . This is high-activity work. It is demanding work. . . . That will make any of us hurt. It'll make people with fibromyalgia hurt more. So it clearly is significant in terms of increasing somebody's pain. But that doesn't cause the problem."
Dr. Hansen testified that plaintiff's diabetes would not be a contributing factor as to her development of muscle fatigue, hand cramping and fibrositis, although she could have developed carpal tunnel syndrome from the diabetes alone.
Dr. Hansen would not have changed plaintiff's work duties. On the other hand, pain is subjective, and subjective pain may very well limit plaintiff's ability to do the work. (Dr. Hansen repeated the example of Larry Bird who had to quit playing basketball because of back pain although there were no objective signs of back problems). He discussed quitting her job with plaintiff who felt the job was causing her problems and "I indicated this could very well be the case," and that it would be reasonable that under such circumstances after nine years to say she just could not do the job any more.
Dr. Hansen felt that the conditions for which plaintiff was seen in 1998 and 2000 were "absolutely" the same condition for which he had seen her in 1995.
Dr. Lisa Nocera is board certified in anesthesiology with a sub-certification in pain management. She saw plaintiff in 2000 and diagnosed chronic pain syndrome with depression and sleep dysfunction. She could not reach a diagnosis of fibromyalgia as plaintiff only had 6 of 11 tender points. She did respond to a hypothetical that she felt it was possible for plaintiff's repetitive work to have been a cause of her medical condition.
27. There was no evidence from any medical provider that plaintiff's work at Perdue caused her carpal tunnel syndrome or chronic pain. There was no evidence that any medical provider had written her out of work because of an occupational disease caused by her work at Perdue.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
There was insufficient evidence to prove that plaintiff developed carpal tunnel syndrome, fibromyalgia, chronic pain and depression as a direct result of her position with Perdue Farms. There was insufficient evidence to prove that plaintiff's position placed her at an increased risk of developing these occupational disease as compared to general population not so employed.
 *********** ORDER
Under the law, plaintiff's claim must be and hereby is DENIED.
No costs are assessed.
This 19th day of February 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER